## DANIEL F. HANLON *vs.* WILLIAM O. THOMPSON.

Essex.    November 5, 1896. — November 24, 1896.

Present: ALLEN, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Master and Servant — Occupation of Premises — Implied Invitation to use Way — Due Care — Law and Fact.*

In an action for personal injuries received by the plaintiff while working in an ice-house, it appeared that he was not hired by the defendant, but by C., who had sold the ice business to the defendant. Both C. and the defendant testified that C. had agreed to fill the icehouse, and that the men were employed by C. to do the work. The plaintiff and several of the men testified that they were working for the defendant, who, on cross-examination, admitted that he employed two teamsters to haul ice from the pond to the icehouse; and another witness testified that he worked for the defendant in delivering ice from the icehouse to customers. There was also evidence that the defendant owned all the teams and other personal property used in the business, and that the men were paid at his office by his agent. *Held*, that there was evidence sufficient to warrant a finding that the plaintiff was in the defendant's employ.

C., who was in the ice business, had a lease of premises which were described as "frame buildings, sheds, and stable." There were on the premises an open shed and an enclosed one. C. sold the business and property used in it to B., who assumed payment of the rent, and took an assignment of the lease. By an agreement between them, C. filled the icehouse and employed men to do the work, who were paid at B.'s office by his agent; and B. delivered ice from the icehouse to customers. A., while employed on the premises, was injured by the defective condition of the floor of the enclosed shed. *Held*, in an action by A. against B. for his injury, that the jury might find that the shed in question was occupied by B.

If workmen employed about an icehouse are in the habit of using commonly, in going to and from their work, a plank walk reached by a ladder and extending across the floor of an enclosed shed from one door to an opposite door opening upon a platform having entrances into the icehouse, it may be inferred that the employer knew of this practice, and that is some evidence, in an action by a person so employed for injuries occasioned by the defective condition of the floor, of an implied invitation or permission by the employer for the workmen to use the walk as they did.

In an action for personal injuries occasioned to the plaintiff, who was employed about an icehouse, by the giving way of the floor of a shed, across which a plank walk, used commonly by the workmen in going to and from their work, extended from one door to an opposite one opening upon a platform having entrances into the icehouse, if the plaintiff's evidence is that the floor looked safe, and the defendant's evidence is that it was in an obviously unsafe condition, the question of the plaintiff's due care in using it is for the jury. It cannot be held, as matter of law, that he was bound to look underneath to see if the timbers were sound and strong.

TORT, for personal injuries occasioned to the plaintiff, while in the defendant's employ, at an ice plant in Haverhill, by the alleged negligence of the defendant in permitting the floor of a building to be in an unsafe condition. Trial in the Superior Court, before *Sherman*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff testified, among other things, as follows : " On February 27, 1894, while working for the defendant, I was injured. At that time I had been working for him about a week. At the time I was injured the ice had been filled in so that the westerly entrance in the icehouse could not be used. There was a ladder from the bottom of the open shed to the southerly doorway in [an enclosed] shed ; there was a walk of boards from the top of the ladder across the shed to the door on the northerly side. These boards rested upon timbers which looked to be large timbers. As one passed through the northerly doorway they came to an open platform on which the ice was run from the sheds, and from that platform there were entrances into the icehouse. The open platform was about the same height as the shed floor ; and the cellar of the shed was ten or twelve feet deep. My work was stowing ice away in the house, and also working on the platform. The men at work on the platform, after eating their dinner, would go from the stable through the open shed, up the ladder, and follow the walk through the other shed out to the platform. They also used the westerly entrance into the icehouse until it got filled. After eating my dinner I stayed in the stable until the men got ready to go to work and the whistle blew ; and the defendant's father was underneath the shed cleaning some wagons, and he told us there was a ladder there, and we went up the ladder, some other men and myself. I went up and got off the ladder, and had got a short distance along when I felt something give way, and I fell, and the floor went with me. I fell ten or twelve feet."

On cross-examination, the plaintiff testified as follows : " The shed was light the day I was hurt ; there was no trouble in seeing, and the floor of the shed looked all right. I could n't see that it was rotten or decayed in any way; it looked perfectly sound and safe. I never made any examination of the floor

before I was hurt; I didn't know that I needed to. The shed tumbled down a short time after I was injured. There was nothing to prevent making an examination. In places the floor was partly uncovered. I was working for the defendant; he didn't hire me, but Mr. Cushman did. I was paid at the defendant's office by a Mr. Sylvester. I don't know who put the ladder there. I had used that way but once before. There were some holes in the floor of the shed. Neither the defendant, Cushman, nor Abbott ever directed us to go up the ladder and through the shed to get at the entrance to the icehouse."

One Slocum, a witness called by the plaintiff, testified that, in February, 1894, he worked for the defendant, driving a team for him and drawing ice from the pond to the house; and that the men in the defendant's employ used to pass through the shed when going to and from their work. On cross-examination, the witness testified that the defendant employed him in person, but Sylvester paid him; that the shed was light enough, and the stringers looked safe; that there were no holes in the floor; and that there was nothing to prevent a person from making an examination of the floor, but he would have had to go underneath the floor to do so.

Two other witnesses called by the plaintiff testified that they were employed at the icehouse in 1894, when the plaintiff was hurt; that they were working for the defendant, but were hired by Cushman and paid by Sylvester; and they corroborated the former witnesses as to the use of the shed by the men in going to and from their work. One of the witnesses also testified that he had never been directed by any one to make use of this way of approach to the icehouse.

Charles H. Cushman, called as a witness by the defendant, testified as follows: "I was formerly engaged in the ice business in Haverhill, and occupied the premises in question. I had a lease dated November 20, 1888, which I took from the Haverhill Aqueduct Company. The open shed I built to keep my carts under cover. I made no use of the other shed at the time the plaintiff was hurt. In February, 1894, I agreed with the defendant to sell the business to him. He said, 'I will give you $1,200 for your interest there, provided that you will go right

ahead and fill those houses just the same as you have done previously, and the price of the ice to come out of the $1,200, and have Mr. Abbott decide when the houses are full.' So I went to work and carried out my part of the agreement as well as I could. I hired the men to do the work, and I kept the time of all the men and all the teams. Mr. Sylvester paid them. I considered that I paid them; it was my money, but it was in Mr. Sylvester's safe for safe keeping. There was an agreement between the defendant and me for Sylvester to give the money. The shed was in a very dangerous condition, which any one could see, and no orders had been given to use the shed in going to and coming from the work. I do not know who placed the ladder; it was not done at my request, or by my orders. I did n't invite, request, or order any one to go through the shed at any time or for any purpose."

On cross-examination, the witness testified as follows: " To the best of my recollection I told Mr. Jones [the plaintiff's counsel] that I sold out to the defendant about the first day of February, and I told him that at the time the plaintiff was employed I hired the men, but hired them as agent for the defendant. At the same time I sold my business to him, I sold him all the personal property that I had in the ice business, carts, wagons, harnesses, tools, implements, and fixtures. I gave him a bill of sale of it. I paid the rent up to the first day of January, 1894, and paid no rent afterwards. I don't remember signing any other papers at the time of giving the bill of sale, but I wont say that there were not any others signed. The defendant, at the time of the sale, assumed the rent from January 1, 1894. All the money that was paid to the men in February, 1894, was money that was handed to Mr. Sylvester by the defendant, and all the horses and all the wagons, carts, and harnesses that were used in that business in February, 1894, were the property of the defendant, excepting some that we had to hire outside."

A. Melville Allen, a witness called by the defendant, testified that he was chairman of the board of water commissioners of the city of Haverhill, and during the month of March, 1894, executed an assent to the assignment of the lease from Cushman to the defendant, and delivered it to him or to Cushman.

Enos A. Amberg, a witness called by the defendant, testified, in substance, that he had worked around the icehouse for Cushman, Abbott, and the defendant; that in February, 1894, there was no floor at all in the shed, the beams were all decayed, and the shed was light; and that there was no difficulty in ascertaining the condition of the floors and timbers, if any one had wished to.

On cross-examination, he testified, in substance, that it might not have been apparent that the upper part of the beams were rotten, but that the bottom of them was rotten, and any one could see it by looking underneath; and that in February, 1894, he worked for the defendant, delivering ice from the icehouse to the customers both before and after the plaintiff was injured.

Alonzo Sylvester, called as a witness in behalf of the defendant, testified that Cushman and the defendant stated their agreement to him, and its terms were as testified to by Cushman; that, at the request of both, he acted as agent between them; and that the defendant furnished the money, and he paid the men upon the order of Cushman.

John F. Abbott, called as a witness for the defendant, testified that he carried on the ice business at these same icehouses for a number of years; that the defendant employed him to see that Cushman filled the icehouses in a proper manner; that he was very familiar with the condition of the shed, and it was unsafe to use; that no use was made of it at the time of the accident; that there was no walk of boards across it, and it was very easy for any one to see what its condition was; and that the boards and timbers were pretty much all rotten.

The defendant testified in his own behalf, corroborating Cushman, Sylvester, and Abbott as to the various agreements between them, and as to the condition of the shed. He also testified that the teams he purchased from Cushman were used in filling the shed, and that, in the final settlement between them, the price of those teams was deducted from the money coming to Cushman; and further testified as follows: " Mr. Cushman hired the men engaged in filling the icehouses, I did not; I only hired my teamsters. I assumed the rent from January 1, 1894, to the time I bought him out. Cushman was to fill these houses with good merchantable ice, and Abbott was to be the judge; the ice-

houses were to be filled satisfactory to Abbott, and I was to accept them."

On cross-examination, he testified that on February 14, 1894, the date of the bill of sale, he paid $600 for the personal property which Cushman conveyed to him; that the property consisted of horses, harnesses, teams, and ice rigging generally, and was then in the stable; that he continued to keep it in the stable, and paid the grain bills, and paid the teamsters, who used that property in carrying on the ice business; that Abbott was there to see that the ice was placed properly, and the defendant, being busy elsewhere, could not attend to it himself; that he employed one Slocum to drive the defendant's team in hauling ice from the pond to the icehouses, and the same was true of another teamster whom he employed; that he understood that the teams and property described in the bill of sale were his absolute property on February 14; that he made a settlement with Cushman about March 22, 1894; and that compensation was allowed him for all work done by his teams or men in filling the icehouses. He also testified that he had an assignment in writing of the lease, but afterwards stated that he would not be positive.

The lease from the Haverhill Aqueduct Company to Cushman, which was put in evidence, described the property as " the frame buildings, sheds, and stable."

At the close of the evidence, the defendant requested the judge to give the following rulings: " 1. On the whole case the plaintiff is not entitled to recover. 2. There is not sufficient evidence to warrant the jury in returning a verdict for the plaintiff. 3. The condition of the building and the floor through which the plaintiff fell was open and obvious, and the plaintiff must be held to have assumed the risk of the danger arising from such condition, and cannot recover in this action. 4. There is not sufficient evidence to warrant the jury in finding that the plaintiff was the servant of the defendant, and therefore the plaintiff cannot recover in this action. 5. There is no evidence to warrant the jury in finding that the defendant was a person occupying the shed in which the plaintiff was injured as a tenant having control of it, and being, as to the plaintiff, under the duty of keeping

it in repair and in a safe condition, and therefore the plaintiff cannot recover."

The judge refused to give these rulings, and submitted the case to the jury with instructions which were not excepted to. The jury answered questions submitted to them, as follows:

" *Q.* Who was the employer of the plaintiff? *A.* William O. Thompson.

·" *Q.* Was the defendant Thompson in the actual possession and control of the shed wherein the plaintiff was injured? *A.* Yes."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*W. H. Moody & H. E. Bartlett,* (*J. H. Pearl* with them,) for the defendant.

*B. B. Jones & M. A. Pingree,* for the plaintiff.

ALLEN, J.   1. There was evidence sufficient to warrant a finding that the plaintiff was in the employment of the defendant. It is true that the plaintiff was not hired by the defendant personally, and that both Cushman and the defendant testified that Cushman had agreed to fill the icehouses, and that the men were employed by Cushman to do the work. But from the other testimony the jury might think that these statements ought not to be taken as literally accurate. Cushman's testimony was somewhat qualified by his cross-examination. And the defendant, on cross-examination, admitted that he employed one or two teamsters to haul ice from the pond to the icehouses, and another witness testified that he worked for the defendant in delivering ice from the icehouses to customers. There was also evidence that the defendant owned all the teams and other personal property used in the business, and that the men were paid at his office by his agent.

2. The jury might also find that the shed where the accident occurred was occupied by the defendant. The lease to Cushman embraced " sheds " in the plural, and the jury might find that this shed was included in it. The accident was not till February 27. Cushman sold out his business and property on or about February 14, and the defendant assumed payment of the rent from January 1. The defendant at first testified that he had an assignment in writing of the lease; but he afterwards

qualified this statement by saying that he would not be positive. The jury might believe that he had such an assignment. Certainly the evidence tended to show that it was well understood that he was to succeed Cushman as tenant of the leased premises; that he had bought Cushman's ice business and teams; and that he was engaged in carrying on that business by aiding at least in filling the icehouses, and by delivering ice to customers. The jury might find that he was in possession as tenant of the shed in question, as well as of the other buildings included in the lease.

3. There was also some evidence, the weight of which was for the jury, of an implied invitation or permission by the defendant for the men to pass through the shed on their way to and from their work. The situation of the premises might be taken into account. Several witnesses testified that the men were in the habit of going that way. If the way through the shed was commonly used by men in the defendant's employment, it might be inferred that he knew of this practice, and that is some evidence of an implied invitation or permission for the plaintiff also to use it, if he also was in the defendant's employment, and was at work with the others. See *Dolphin* v. *Plumley, ante,* 167.

4. The question of the plaintiff's due care was also for the jury. It cannot be held, as matter of law, that he was bound to look underneath, to see if the timbers were sound and strong.

Upon all the evidence, the case was properly submitted to the jury.

*Exceptions overruled.*