PATRICK BYRNE *vs.* SAMUEL S. LEARNARD & another.

Suffolk, January 26, 1906. — March 7, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, & SHELDON, JJ.

*Negligence,* Employer's liability.

If a workman with no knowledge of machinery is ordered by a superintendent of his employer to leave his ordinary work, which is not dangerous, and take the place of another workman during his dinner hour upon a machine the danger of which is not obvious, and is ordered by the superintendent to do the work in a certain manner exposing him to danger without warning him of it, and the workman in doing as he is told is injured by the machine, he can recover from his employer.

A workman who is set at work by a superintendent of his employer upon a dangerous machine to take the place of another workman during his dinner hour without being warned of the danger, and who after the expiration of the dinner hour and after the return of the regular operator of the machine continues to work on it for three quarters of an hour longer, at the end of which time he is injured by the machine, is not barred from recovering from his employer on the ground that when injured he was acting outside the scope of his duties if he had reason to suppose that the superintendent knew what he was doing and kept on working because the superintendent did not tell him to stop.

In an action by a workman in an abattoir against his employer for personal injuries, the following facts appeared: The plaintiff came from Ireland where he had worked on a farm but never had worked with machinery. A week after his

arrival in this country he was employed by the defendant, to work in the basement, wheeling fat on trucks, loading and unloading teams and whitewashing. One day in the third week of his employment the defendant's superintendent set him at work feeding fat into a chopping machine called a hasher from twelve to one o'clock while the regular operator of the machine was away from it. About a week afterwards the plaintiff again worked on this machine for something less than an hour while the same workman was away, and while thus at work the defendant's superintendent came toward him on the floor beneath the platform on which the machine stood and made motions with his hands to indicate that the plaintiff should use both of his hands in pressing the fat into a tunnel that led from the flat table at which the plaintiff worked, and told him to do it that way and to put the fat through quicker, to "press right tight into the machine with both hands," and the plaintiff did so while the superintendent stood there watching him. About two weeks later while the plaintiff was loading fat into a truck the superintendent said to him "go to your dinner at eleven o'clock, and come back at twelve, and go on the hasher." The plaintiff did so, and worked on the hasher until one o'clock when the workman who regularly operated the hasher returned. This workman instead of taking the plaintiff's place at the hasher began to do the plaintiff's regular work and the plaintiff continued to work on the hasher. He went on doing the work · as the superintendent had instructed him for three quarters of an hour longer, and then as he was pressing the fat tight into the mouth of the tunnel with both hands it went off with a plunge from his hand and took his right hand into the machine with it, and his arm was cut off below the elbow by the revolving knives below the tunnel. Below the tunnel was a cylinder box about twenty-four inches long and eight or ten inches square which encased a revolving shaft set with knives put on spirally, there being other knives fixed on the inside of the cylinder, and the fat was cut between the two sets of knives as it was forced through the cylinder by the action of the spiral knives attached to the shaft which made six or seven hundred revolutions a minute. The opening into the tunnel was about eight or ten inches in diameter, and the knives were about eight inches below it. A mechanical engineer testified that when the machine was in operation a man could not tell anything about the internal parts of it, that the knives when revolving at this rate of speed could not be distinguished readily as separate knives, and that when looking down into the tunnel, if there was no fat to obstruct the view, all that any one could see was the part of the knives that went across the five or six inch circle at the bottom of the tunnel, and when the machine was in motion one could see only the whirl of revolving machinery. The plaintiff testified that he did not know how the machine was operated and did not understand it, that he never had seen it standing still, that the mouth of the machine was always covered with fat when he saw it and he never had seen what was in the opening, that he did not know that there was anything inside the machine that chewed up the fat although he knew that the fat came out softer after passing through it. He also testified that on the day of the injury he knew that it was the duty of the workman whose place he took to run the machine until twelve o'clock, that it was the plaintiff's business to run it until one o'clock, when it was the other workman's business to go on with it again, so that it was not part of the plaintiff's work to run the machine at the time he was injured, and that he was supposed to leave it at one o'clock and go back into the basement. *Held*, that it could not be said as matter of law that the plaintiff assumed the risk of the injury he received; that there was evidence that the plaintiff was in the exer-

cise of due care; and also evidence that the plaintiff's injury was due to the negligence of the defendant's superintendent in instructing the plaintiff to do his work in an improper and dangerous manner and failing to warn him of the risk thus incurred; *also,* that it could be found that the plaintiff at the time of his injury was not acting outside the scope of his duties and in disobedience to orders in continuing to run the machine after the return of the regular operator at one o'clock.

SHELDON, J. This is an action of tort under R. L. c. 106, § 71, with a count at common law, to recover for injuries sustained by the plaintiff while in the employ of the defendants and at work feeding fat or suet into a chopping machine called a hasher in their building at the abbatoir in Brighton. Proper notice had been given to the defendants, and no question is raised as to this or as to the pleadings.

The plaintiff came to this country from Ireland on May 6, 1901. He had worked on a farm, but never on machinery. On May 13, 1901, he went to work for the defendants at their abbatoir. Here he was employed for two weeks in the cellar, wheeling fat on trucks, loading and unloading teams, and whitewashing. At the beginning of the third week, Hapgood, the defendants' superintendent, told him that at noon of the next day he would put him at work on the hasher; and the plaintiff went to work on this machine the following day at noon.

One working on this machine stood at a bench or table, which was three and a half feet above the floor. At one end of this bench there was a hole eight or ten inches in diameter, opening into the hasher by a tunnel shaped receptacle, the top of which was flush with the top of the table and of the same diameter as the hole itself, and which tapered downward into one end of an iron cylinder box. This box contained a shaft running longitudinally with the box and extending entirely across the bottom of the tunnel, set with knives put on spirally so as to form a worm or screw. This shaft was attached to a fast and loose pulley operated by steam power, so that when the machine was running it made six hundred or seven hundred revolutions a minute. The diameter of the tunnel at its bottom where the knives revolved was five or six inches, and the distance from the opening in the bench to the top of the knives was about eight inches. The cylinder box was about twenty-four inches long and eight or ten inches square, and wholly encased the knives

and revolving shaft, so that these were not visible except through the mouth of the tunnel when empty. Besides the spiral knives, there were other knives fixed on the inside of the cylinder, and the fat was cut up between the two sets of knives as it was forced through the cylinder by the action of the spiral knives.

The machine was placed on a platform or staging midway between the third and fourth floors of the building. The suet and fat to be hashed were brought up from the basement on an elevator, and placed on the table at the right hand of the man feeding the machine, and by him pushed along the table by hand into the mouth of the tunnel. After passing through the cylinder, the material came out at the other end a pulpy mass, and passed through a chute into a kettle on the floor below. All the mechanism was below the table and out of sight of the operator.

When the plaintiff went to work on this machine at noon, he found a man named Duggan at work upon it, and watched him for a second or two until he stepped one side, and then the plaintiff began to put the fat through the hole with both hands, as he had seen Duggan do, and continued this work for an hour, when Duggan returned. About a week afterwards, the plaintiff again worked on this machine in the same way for something less than an hour, while Duggan was away. On this occasion, while the plaintiff was working, as he testified, Hapgood came towards him, on the floor beneath the platform on which the machine stood, and made motions with his hands to indicate that the plaintiff should use both his hands in pressing the fat into the tunnel, and told him to do it in that way, and to put the fat through quicker, to "press right tight into the machine with both hands"; and the plaintiff did so, pressing it tight into the machine with both hands, while Hapgood stood there watching him.

The third time, on June 17 in the same year, while the plaintiff was loading fat into a truck, Hapgood said to him, "Patrick, you go to your dinner at eleven o'clock and come back at twelve and go on to the hasher." The plaintiff did so, and worked until one o'clock, when Duggan came back and began to do the plaintiff's regular work, and the plaintiff continued to work on this machine. He testified that he went on doing the work as Hap-

good had instructed him, pressing the fat tight into the machine with both hands, for three quarters of an hour longer; and then, while he was pressing it tight into the mouth of the tunnel, the fat went off in a plunge from his hand, and took his right hand into the machine with it and his arm was taken off below the elbow. He testified that he was doing the work in the only way that had been shown him; that he did not know how the machine was operated, that he did not understand it, and never had seen it standing still; that it was operated by pulleys, and he had nothing to do with the operation; that the mouth of the machine was always covered with fat when he saw it, and he never had seen what was in the opening; that he never had seen anything like a wooden pounder used to press the fat in; that he did not know that there was anything inside the machine that chewed up the fat, although he knew that the fat came out softer after passing through the machine. He also testified, on cross-examination, that on the day he was hurt he knew that it was Duggan's duty to run the machine until twelve o'clock, and the plaintiff's business to run it then until one o'clock, and then it was Duggan's business to go on with it again, so that it was not part of the plaintiff's work to run it at the time he was hurt; and that he was supposed to leave it at one o'clock and go back into the basement.

One Fairbairn, a mechanical engineer, described this machine and its operation substantially as already stated, and said that it was similar to the domestic machines used in families for making mincemeat; that when it was in operation a man could not tell anything about the internal parts of it; that the knives made between six hundred and seven hundred revolutions a minute, and at that speed could not be readily distinguishable as separate knives; that the worm for pushing the fat along extended under the entire opening at the bottom of the tunnel; that all that any one could see, when looking down into the tunnel, if there was no fat to obstruct the view, was the part of the knives that went across the five or six inch circle at the bottom of the tunnel; that the worm is visible through the tunnel if empty when the machine is still, but when it is in motion, one looking in when there was no fat to obstruct his view, would see only the whirl of revolving machinery.

One Griffin, a carpenter, testified that he built the floor under this machine, and helped make the bench that the fat was laid on; that the bench was composed of a board with just enough of a railing to keep the fat on, an inch or an inch and a half high; that the man who was feeding the machine used both hands to push the fat along the bench into the hole, and kept feeding the machine, using both hands.

At the end of the plaintiff's evidence, the material parts of which have now been stated, the judge who presided at the trial ordered a verdict for the defendants; and the case comes before us upon the plaintiff's exceptions to his ruling.

The defendants contend that the case comes within the rule laid down in *Chmiel* v. *Thorndike Co.* 182 Mass. 112; *Sullivan* v. *Simplex Electrical Co.* 178 Mass. 35; *Robinska* v. *Lyman Mills*, 174 Mass. 432; and *Stuart* v. *West End Street Railway*, 163 Mass. 391. But in each of these cases the plaintiff either saw the knives or needles or revolving cylinders which constituted the danger or would readily have known of their existence by the use of ordinary care; and each one of these cases really turns upon the fact that the danger was obvious, so that the respective plaintiffs were deemed to have assumed the attendant risks, and stood in no need of instruction. Here the jury might have found that the plaintiff was put to work upon the machine when it was in motion and the danger of letting the hands get into the tunnel was not obvious, and when he was manifestly wholly ignorant of the situation and of the risks involved; and that he was instructed to push the fat into the tunnel with both hands in a way that could be safe only if there was no danger in the hands getting into the tunnel. The whole mechanism of the machine was concealed from his view. In view of the instructions which the jury might find that he had received, they might also find that he was justified in believing that anything dangerous in the internal arrangement of the machine was situated further along in the body, and not directly under the tunnel. And if, as he testified, he followed exactly the directions which he received, they also might find that he was in the exercise of due care. We do not think that it can be said as matter of law that he assumed the risk. And the jury might have found that the accident was due to the negligence of Hapgood,

the defendant's superintendent, in instructing the plaintiff to do his work in an improper and dangerous manner, and in failing to warn him of the risk of injury that he thereby incurred. *O'Brien* v. *Nute-Hallett Co.* 177 Mass. 422. *Bowden* v. *Marlborough Electric Machine & Lamp Co.* 185 Mass. 549. *Dolan* v. *Boott Cotton Mills,* 185 Mass. 576. In this event the defendant would be liable for Hapgood's negligence not only under R. L. c. 106, § 71, but also at common law. *Bowden* v. *Marlborough Electric Machine & Lamp Co., ubi supra. Sullivan* v. *India Manuf. Co.* 113 Mass. 396, 400.

But the defendant contends that at the time of the injury the plaintiff was acting outside the scope of his duties, and really in disobedience of orders, because he continued to run the machine after one o'clock and after the return of Duggan; and the plaintiff himself testified that it was no part of his business to continue here after Duggan's return at one o'clock. *Mellor* v. *Merchants' Manuf. Co.* 150 Mass. 362. *Aziz* v. *Atlantic Cotton Mills,* 189 Mass. 156. But there was testimony that on this day the superintendent simply told the plaintiff to go to work here at twelve o'clock, and nothing was said about the time at which he should leave this and go to his usual work. The jury would have a right to consider whether the plaintiff's conduct in continuing to work where the superintendent had put him, lasting as it did for three quarters of an hour, was not known to the latter and approved by him. They might construe the language of the plaintiff on this subject in cross-examination as rather a complaint of the conduct of the superintendent in not relieving him from this work than as a statement that he was openly violating the orders which he understood to have been given him. This was a question for the jury to pass upon.

*Exceptions sustained.*

*C. Reno & J. P. Fagan,* (*J. E. Cotter* with them,) for the plaintiff.

*G. L. Mayberry,* (*W. F. Garcelon* with him,) for the defendants.