LEROY L. LEWIS *vs.* WILLIAM COUPE.

Bristol. October 26, 1908. — November 24, 1908.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Negligence,* Employer's liability. *Practice, Civil,* Conduct of trial. *Witness,* Cross-examination.

If the proprietor of an ice run orders a teamster who has been driving a pair of horses to change places with a man who is working on the run, and the change is made, or if without a direct order of the proprietor the change is made with the cognizance and approval of the proprietor's superintendent who has full authority to represent the proprietor in the matter, the proprietor is liable to the teamster who left his horses to work on the ice run if while so working he is injured by reason of the negligence of the proprietor in furnishing an unsafe chain as part of the machinery of the run.

A jury are not bound to believe testimony because it is uncontradicted.

If a witness on his cross-examination gives an answer which is not strictly responsive to the question, but which is germane to the subject of the inquiry and is material and competent evidence, it is within the discretion of the presiding judge to refuse to strike out the answer as non-responsive.

TORT for personal injuries received by the plaintiff on February 1, 1904, while working on an ice run of the defendant. Writ dated May 21, 1904.

At the trial in the Superior Court before *Hardy*, J., the following facts appeared: The accident happened on the defendant's ice run in Attleborough while three or four cakes of ice were partly up the run on the way to the upper story of the ice house. The ice was being harvested at the time, and the plaintiff, with a grapple in his hand placed against the lower cake of ice, was walking up alongside the lower cake of ice, and on the outside of the run. It appeared that on each side of the run was a solid plank floor with cleats about two feet apart for the walking of men who were assisting in getting the ice from the pond up into the ice house. These walks upon either side of the ice run were about two feet wide, the distance between the cleats was twenty inches, and the length of the run was fifty-two feet. The ice run was partitioned off from the walks on either side by a board which rose a few inches above the level of the ice run floor on either side, dividing the run from the walks on either side. The flooring of the ice run was not solid, but was boarded over in such a way that there were regular open spaces between the boards. The power was furnished by two pair of horses, one on either side of the run, who were driven in a path alongside the ice house in opposite directions, each pair of horses working alternately with the other in raising the ice. The horses were fastened to a rope which went up to a pulley and block at the top of the run, and to this pulley was attached a wire cable which went down the run and was fastened by a wire to a stake chain which was attached to a grapple used to raise the cakes of ice. It was this small chain, where its links were held together by wire, that broke at the time of the accident, and the plaintiff testified that when it broke he was thrown off his balance from the walk and that his left leg went over into the ice run and the boarding fell through, and his leg went down, and before he could extricate himself the three or four cakes of ice which were on the run at the time of the accident, and which he was helping to raise to the ice house, came down on him and broke his leg. The accident happened on Monday, February 1, 1904, at about half-past one

or two o'clock in the afternoon. The ice house was on the same road with the defendant's house and only a few feet away from the defendant's barn.

The plaintiff testified that he was a teamster in the employ of one Horace Knight, who lived in the neighborhood about half a mile away from the place of the accident; that on Sunday, January 31, 1904, one Joran came to Knight's house; that Joran wanted to know where Knight was, and he was not there, and Joran said that he wanted a pair of horses and a man to go to work at the ice house; that Knight was absent at the time; that the plaintiff hitched up the pair of horses and drove them to the ice house some time about the middle of the day, Sunday, January 31, 1904; that he did not see the defendant there at the time he arrived; that the ice was being harvested at the time he got there, and was being put into the ice house; that he hitched the horses to the rope; that he drove these horses for about two hours, and that Frank Knight, a son of Horace Knight, then was working on the right walk opposite the ice run; that one Dennet was working on the left walk opposite the ice run, and that one Monast was driving the other pair of horses, lifting the ice which Dennett was guiding up the run. Against the objection of the defendant, the plaintiff testified that Frank Knight told him that the defendant said, " if the horses wasn't going right to suit him, for to change work."

The plaintiff further testified: " Mr. Knight, Jr., told me that Mr. Coupe said if the horses wasn't going right to suit him, for to change work, and he told me that, and I did. . . . I changed for a little while that Sunday afternoon."

The plaintiff testified that, things not going right and the horses not working well, he changed off with Frank Knight and worked himself on the walk opposite the ice run for a while after that, and then resumed his work later on, driving the horses; that he did not hear the defendant give any instructions to Frank Knight, and only knew what Frank Knight told him; that Joran was all over the pond and was giving orders about the work, both in the absence of the defendant and in his presence; that the run was fifteen or sixteen feet high in the perpendicular, that the ice, at the time of the accident, was going in at the very top of the ice houses; and that at the time of

the accident the plaintiff was about twenty-one feet up from the water.

" I was braced back this way (illustrating), to hold the ice down, and when the chain broke this handle here turned like that (illustrating) and threw me off my balance. I went over and my foot went through the run."

The following also is taken from the plaintiff's testimony : " Q. Now, Sunday, how much work did you do on the grap? How long? A. Well, not but a very little while; probably not over an hour I should n't judge. — Q. About an hour. What time of the day was that, Sunday? A. Well, I should judge in the middle of the afternoon ; probably two to three o'clock. — Q. And after that you went back to the horses? A. Yes, sir. — Q. They were not behaving very well, was that it? A. The horses hadn't been doing much of anything that winter and the noise from the ice kind of scairt them. — Q. And all the morning you were driving the horses, Monday? A. Yes, sir. — Q. And how came you to go on at one o'clock, Monday? How came you to go on the run and work with the grapple? A. The horses — I thought if anybody else could use the horses better than I could, and get along any better, let them do it. As Mr. Coupe told Mr. Knight, Jr., to change around with me, I did. — Q. Who told you to go on at one o'clock, on to the run? A. Who told me to? — Q. Yes. A. Mr. Knight, Jr. — Q. And following those orders you went on the run and stayed an hour before you were hurt? A. Yes, sir. It might have been a little after one ; I can't say just to the minute to the time of day it was. — Q. You didn't know that there was anything the matter with this chain before you were hurt? A. No, sir, not until afterwards. I heard afterwards that it had broke before."

Other evidence is described in the opinion.

At the conclusion of all the evidence the defendant moved to strike from the plaintiff's testimony that part of it in which the plaintiff stated that Mr. Knight, Jr., told him that the defendant said " if the horses were not going right to suit him, for to change work, and he told him that." The judge refused to strike it out.

The defendant also asked the judge to order a verdict for him on all the evidence, and to rule that the plaintiff could not

recover. The judge refused so to rule, and submitted the case to the jury, who returned a verdict for the plaintiff in the sum of $675. The defendant alleged exceptions.

*F. S. Hall*, for the defendant.

*C. R. Cummings,* (*P. E. Brady* with him,) for the plaintiff.

SHELDON, J. The defendant's contention as presented to us is that a verdict should have been ordered in his favor for the reasons, first, that the plaintiff was not employed or authorized to do the work which he was doing at the time that he was hurt, and second, because the business in which the plaintiff was employed was the business not of the defendant, but of one Angell, and that both the defendant and the plaintiff and all other men employed in the business were merely salaried employees of Angell. If either of these contentions was established, the action could not be maintained. But a verdict could not be ordered for the defendant upon either ground if there was any evidence upon which the jury could find that the defendant's contention was not made out.

1. If the plaintiff on Monday, when he was injured, in going upon the ice run and beginning to work there in hoisting up the ice from the water, did this of his own motion or at the mere request of Knight, without authority from the defendant or from the defendant's superintendent, then he was acting in excess of his duty, beyond the scope of his employment, as a mere volunteer, and cannot recover for any injury that resulted from his having undertaken work that he was not employed or expected to do. *Aziz* v. *Atlantic Cotton Mills*, 189 Mass. 156. But there was evidence that when the plaintiff first began to work for the defendant the defendant himself directed Knight to drive the horses and to put the plaintiff at work on the ice run, and that the change was made accordingly. Knight, to be sure, testified that this was to last until the horses had quieted down; but Monast and Butler gave no such limitation to the order, but stated that the defendant simply spoke of the nervousness or fright of the horses as the reason for his order. Moreover, upon the defendant's own testimony it could have been found that Joran's power of control and management of all the work and of the men engaged in it was full and complete, and there was testimony that Joran frequently saw the plaintiff at work on the

ice run before the accident and on that occasion, and expressed no dissatisfaction. Indeed, Joran himself so testified. He added that the change, meaning, we suppose, such a change as was made between Knight and the plaintiff, was made quite often, and also that the change was perfectly satisfactory to him, and that when Knight left his position on the run and came down to drive the horses, it was perfectly proper for the plaintiff to take hold of the grapple, and that it was perfectly agreeable to him, Joran, that the plaintiff should do so. It is plain that the jury had a right to find that what the plaintiff did was done, if not in accordance with a direction given by the defendant, yet with the cognizance and approval of the defendant's superintendent, who had as to this matter full authority to represent the defendant himself. *Saures* v. *Stevens Manuf. Co.* 196 Mass. 543, 548. *Byrne* v. *Learnard,* 191 Mass. 269, 275. *Manning* v. *Excelsior Laundry Co.* 189 Mass. 231, 233.

2. The defendant's second contention rests upon his own testimony that in 1897 he had transferred to Angell all his property for the benefit of his creditors, that this assignment was still in full force and effect, that it covered all the property used in this ice business and the business itself, and that the defendant was merely in the employ of Angell upon a salary. But the jury were not bound to believe this testimony, even though it was uncontradicted. *Lindenbaum* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 314. *Bearse* v. *Mabie,* 198 Mass. 451, 456. *Stouffer* v. *Curtis,* 198 Mass. 560, 562. And apart from this, from the defendant's own testimony upon cross-examination, it well might be found that he was in independent charge of this business, and was himself the employer of all the people who were engaged in it. In *Hanlon* v. *Thompson,* 167 Mass. 190, relied on by the defendant, the question who was the employer of the plaintiff was submitted to the jury.

3. The judge was not required to strike out the answer given by Joran that " it was a proper thing, supposed to be the thing for him [the plaintiff] to take hold of the grap." This was not strictly responsive to the question ; but it was given upon cross-examination ; it was germane to the subject then being inquired about ; it was itself competent. It went to show the plaintiff's duties and the scope of the plaintiff's employment, and confirmed

the evidence of the witness's approval of the plaintiff's conduct. In view of the testimony which the defendant had given as to this witness's authority and power of control, this was material evidence, and the judge was not bound to strike it out.

4. It has not been contended that there was not sufficient evidence to warrant findings that the plaintiff, though in the general employment of the elder Knight, was at the time of the accident in the service of the defendant, if the defendant was running the ice business; that the injury was due to negligence of the defendant in furnishing an unsafe chain; and that the plaintiff was himself in the exercise of due care, and had not assumed the risk of the accident by which he was injured. The exception to the refusal of the judge to strike out the plaintiff's evidence as to what the younger Knight told him about the defendant's direction to change work has not been argued, and we treat it as waived.

*Exceptions overruled.*